**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JON DOWNS,
                **Plaintiff,**

       **v.**                             **Case No. 2:03-CV-1117
                                       JUDGE EDMUND A. SARGUS, JR.
                                       Magistrate Judge Norah McCann King**

AOL TIME WARNER, INC.,
                **Defendant.**

## OPINION AND ORDER

This matter is before the Court for consideration of the Defendant's Motion for Summary Judgment (Doc. #14).  For the reasons that follow, the motion is denied.

### I.

Plaintiff Jon Downs, ["Plaintiff"], brings this action claiming that he was discriminated against by his former employer, Defendant AOL Time Warner, Inc. on account of a disability in violation of the Americans with Disabilities Act ["ADA"], 42 U.S.C. § 12101, *et seq.*  Plaintiff also asserts state law claims for handicap discrimination pursuant to R.C. §§ 4112.01 and 4112.99, violation of Ohio public policy and intentional infliction of emotional distress.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

Plaintiff began employment with the CompuServe unit of Defendant AOL Time Warner in July 1997 as a "Computer Room Operator."  (*Deposition of Jon Downs*, hereinafter "*Plaintiff's Depo.*" at 227-29).  In this capacity, Plaintiff maintained file saves, ensured that updates were performed on the computer system and performed various operating procedures as

scheduled. (*Id.* at 230). In February of 1998, CompuServe merged with AOL. Plaintiff's duties as Computer Room Operator remained unchanged. (*Id.* at 234-35).

In October 2001, Plaintiff suffered a diabetic coma[1]. Plaintiff was on medical leave until February 3, 2002. (*Id.* at 239). Plaintiff returned to his previous position and shift (the first shift), which required him to work from 7:30 a.m. to 5:30 p.m. (*Id.* at 240). Sometime later in February 2002, Plaintiff was assigned to work the third shift. The assignment was made by Tom Davis, a supervisor for the computer operators. Davis also moved an employee from the third shift to the first shift so that Davis could better monitor the employee's performance. (*Davis Depo.* at 27-29). Plaintiff's job tasks on the third shift were essentially the same as those performed on the first shift. (*Plaintiff's Depo.* at 245-46). Plaintiff's new schedule was 10:00 p.m. to 8:30 a.m. (*Henderson Depo.* at 171). Plaintiff's supervisor on the third shift was Bryan Lloyd, who also suffers from diabetes. (*Plaintiff's Depo.* at 243; *Lloyd Depo.* at 16).

In the summer of 2002, Plaintiff began failing to report when scheduled to work on the weekends. In July 2002, Plaintiff met with his supervisor, Bryan Lloyd, and Lloyd's supervisor, Randy Slicker, regarding Plaintiff's absences. (*Plaintiff's Depo.* at 247-48). Plaintiff informed Lloyd and Slicker that he was having trouble controlling his blood sugar during third shift working hours. (*Id.* at 249). Plaintiff's work schedule on third shift meant that he worked for five nights followed by four days off. (*Id.* at 245). According to Plaintiff, the only way to alleviate the effect this schedule had on his diabetes would be to "be on the overnight schedule

---

[1]Plaintiff suffers from Type II diabetes. Plaintiff is also obese. According to Plaintiff's physician, Dr. Scott Prenger, Plaintiff needs to lose about 200 lbs in order to "conceivably cure himself of his diabetic condition." (*Affidavit of Dr. Prenger* at ¶ 2 attached to Memorandum *contra*). Dr. Prenger opines that Plaintiff cannot lose weight by dieting alone. Rather, Plaintiff is in need of gastric bypass surgery. (*Id.*).

24 hours a day, seven days a week." (*Id.* at 253). Lloyd and Slicker suggested that Plaintiff consider applying for a position at the Call Center, which operated only during the first shift. (*Id.* at 249-52). Lloyd and Slicker also suggested that Plaintiff take FMLA or short-term disability leave in order to regulate his blood sugar. (*Slicker Depo.* at 24). According to the Defendant, Plaintiff did not pursue either of these options.

On September 25, 2002, Plaintiff met with Laura Henderson, Human Resources Manager, to discuss the possibility of leaving third shift work. (*Plaintiff's Depo.* at 265). Plaintiff presented Henderson with a letter from his physician, Dr. Scott Prenger, regarding his diabetes. (*Id.* at 262-65; Depo. Exhibit 16). The letter states:

> Jon is a 36-year-old patient of mine that suffers from obstructive sleep apnea, severe allergies, and type II diabetes. Jon is currently working an overnight shift, which I assume to be poorly influencing his health. It makes it very difficult with him being a diabetic to work odd hours during the week and weekends resume normal hours when he is not working. It is best for diabetics to plan their schedules and try to eat their meals at the same time. This has been [a] difficulty for Jon in maintaining adequate blood sugar control, as well as getting into a regular exercise pattern. He also suffers from obstructive sleep apnea and often has difficulty sleeping when he gets home from work. Any changes that you can make to his work schedule in order to accommodate these needs would be greatly appreciated.

(Depo. Exhibit 16). Henderson testified that she did not understand the need for moving Plaintiff off the third shift since he had access to a microwave and refrigerator to assist him in regulating his eating schedule while on third shift. (*Henderson Depo.* at 172). According to Plaintiff, working on the third shift made it difficult to maintain a consistent eating schedule.

According to the Plaintiff, his supervisor, Brian Lloyd, was indifferent to Plaintiff's medical condition. Lloyd, who is also diabetic, did not have difficulty maintaining his blood sugar while working on third shift. (*Lloyd Depo.* at 52). According to Lloyd, Plaintiff was not

maintaining a healthy diet because "he would bring in bags of potato chips, doughnuts, brownies, 2-liters of pop, and consume them during the night." (*Id.*). Plaintiff denies this assertion. Despite the request to be removed from third shift work, Plaintiff continued in his position.

In October 2002, Plaintiff was scheduled to attend two weeks of mandatory training. According to Plaintiff, he failed to report to training on October 10 because he was sick. Plaintiff did not report his absence to his supervisor. (*Plaintiff's Depo.* at 329). On October 11, 2002, Plaintiff arrived at training but realized he forgot his materials and then went home. (*Id.* at 273, 328). Plaintiff's timesheet reflected that he worked on both October 10 and 11. (*Id.* at 274). Plaintiff submitted the timesheet midway through his shift on October 13. Plaintiff left early that night due to an elevated blood sugar level. (*Id.* at 275). According to Plaintiff, his indication that he worked on October 10 and 11 was an accident. (*Id.* at 276).

Plaintiff's supervisor, Brian Lloyd, conferred with Randy Slicker, Lloyd's supervisor, regarding Plaintiff's timesheet. (*Lloyd Depo.* at 29-30). Plaintiff's timesheet was corrected to reflect the hours he did work. (*Id.* at 32-33). On October 22, 2002, Plaintiff sent an e-mail to Slicker stating: "Per my timesheet, I was to be paid for 19.5 hours of overtime last pay period and only received 9.5. I don't know whether this was a typo, or what. Please let me know if there is a need for input on my end." (*Pl. Depo.* Exhibit 23). Plaintiff was summoned to a meeting on October 22, 2002 with Henderson, and Slicker to discuss the timesheet. (*Pl. Depo.* at 282). Plaintiff realized the error and explained that he was in a hurry in submitting the timesheet on October 13 because of his elevated blood sugar. (*Id.* at 284). Plaintiff explained that he had actually completed the timesheet prior to the start of the pay period, on October 6, 2002. According to Plaintiff, "[i]t was common practice to fill the timesheet out ahead of time. Most

4

people did it." (*Id.*).

Plaintiff was called to a meeting with Henderson and Slicker on November 4, 2002.  At that time, he was advised that he was being terminated from employment for falsifying a timesheet.  (*Id.* at 287).  Plaintiff claims that the termination was motivated by his medical condition.  The Defendant moves for summary judgment on Plaintiff's claim.


## II.

The procedure for considering whether summary judgment is appropriate, is found in Fed. R. Civ. P. 56(c); this section provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty*

5

*Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III.

In moving for summary judgment, Defendant argues that Plaintiff is not disabled within the meaning of the ADA. Defendant further argues that Plaintiff's termination was motivated by Plaintiff's submission of a false timesheet. Plaintiff's claim under the ADA involves two components - - disparate treatment and failure to accommodate his disability. The Court

6

addresses each theory separately.

## A. Disparate Treatment

The ADA prohibits a covered entity from discriminating against a "qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). As with other claims of discrimination, the Plaintiff may establish a claim under the ADA with direct or indirect evidence of discrimination. Under the indirect method of proof, under which Plaintiff in this case relies, the Plaintiff must first establish a *prima facie* case of discrimination. In this regard, Plaintiff must show: (1) that he or she is disabled; (2) that he or she is otherwise qualified for the position, with or without reasonable accommodations; (3) that he or she suffered an adverse employment decision; (4) that the employer knew or had reason to know of the Plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186-87 (6th Cir. 1996).

Once Plaintiff establishes a *prima facie* case of discrimination, the Defendant must then offer a legitimate non-discriminatory reason for the action taken. If the Defendant satisfies this burden of production, the Plaintiff must come forward with evidence to show that the proffered reason for the action is a pretext for discrimination. In this burden-shifting analysis, the burden of persuasion remains at all times with the Plaintiff. *Id.* at 1186-87.

### 1. Plaintiff's *prima facie* case

The first element of Plaintiff's *prima facie* case is to show that he is disabled. An individual is "disabled" under the ADA if he or she:

> (A) [has] a physical or mental impairment that substantially limits one or more of [his or her] major life activities . . .;
> (B) [has] a record of such impairment; or
> (C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2).

The regulations[2] define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.02(i). In this case, Plaintiff claims that his physical impairment, diabetes, substantially limits him in the major life activity of eating. Eating has been held to be considered a major life activity for purposes of the ADA. *McPherson v. Federal Express Corp.*, No. 03-2006B, 2005 WL 3008648 at *5 (W.D. Tenn. November 8, 2005), citing *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923-24 (7th Cir. 2001). While Defendant does not disagree with this proposition, it does contend that Plaintiff has not shown that his diabetes substantially limits the major life activity of eating.

As the Supreme Court has stated, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195

---

[2]In *Toyota Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 194 (2002), the Supreme Court noted that "[t]he persuasive authority of the EEOC regulations is less clear." Nevertheless, since both parties in that case accepted the regulations as reasonable, the Supreme Court stated that "we assume without deciding that they are [reasonable], and we have no occasion what level of deference, if any, they are due." *Id.*, citing *Sutton v. United Airlines*, 527 U.S. 471, 480 (1999); *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 563 n.10 (1999). The Court notes that no challenge is made in this case as to the reasonableness of the EEOC regulations.

8

(2002). Rather, a disability "exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999). An impairment that is corrected by mitigating measures "does not 'substantially limit' a major life activity." *Id.* at 483. Furthermore, the whether an impairment substantially limits a major life activity is a "individualized inquiry" and must be considered with respect to the individual. *Id.* In order to be substantially limited, "an individual must have an impairment that prevents or severely restricts" him or her from performing daily activities. *Toyota Motor Mfg.*, 534 U.S. at 198. The individual must be "[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). It is insufficient for the individual to suffer only some limitation; rather, the impact of the impairment must be "permanent or long term." *Toyota Motor Mfg.*, 534 U.S. at 198. In this regard, the regulations provide:

> (j) Substantially limits--
> (1) The term substantially limits means:
> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.02(j).

In *McPherson v. Federal Express Corp., supra*, the Plaintiff, an insulin dependent

diabetic, claimed that his diabetes substantially limited him in the major life activity of eating.

Plaintiff worked as a material handler for a Federal Express hub in Tennessee and was prone to

elevations in blood sugar which caused him to miss work. His physician concluded that Plaintiff

was able to work. Plaintiff did not offer evidence as to any dietary restrictions or limitations on

his ability to eat. The court granted summary judgment for the Defendant, stating:

> While diabetes affects an individual's dietary needs, the mere diagnosis does not
> absolve a plaintiff of the obligation to establish a substantial limitation in the
> activity of eating if he is to survive summary judgment. *See Toyota Motor Mfg.*,
> 534 U.S. at 195, 122 S. Ct. at 690; *Sutton*, 527 U.S. at 482, 119 S. Ct. at 2146.
> *Harris v. Challenger Motor Freight, Inc.*, No. 3:98CV7288, 1999 WL 1489819
> (N.D. Ohio Dec. 10, 1999), *aff'd*, 22 F. App'x 606 (6th Cir. 2001) is illustrative.
> In *Harris*, the diabetic ADA plaintiff argued that he was informed by his doctor
> that failure to adhere to a strict eating schedule could endanger his life. *Harris*,
> 1999 WL 1489819 at *9. Nonetheless, the court found that, where there was no
> record evidence that the plaintiff was not able to adhere to that schedule, no major
> life activity was impaired and, thus, he was not disabled. *Id.*

*McPherson*, 2005 WL 3008648 at *6.

Unlike Plaintiff in *McPherson*, Plaintiff in this case offers evidence as to his dietary

restrictions. Plaintiff acknowledges that he is capable of performing the physical act of eating.

Due to his diabetes, however, Plaintiff contends he is unable to eat what he wants because he

risks mild and/or severe reactions to his blood sugar. In addition, Plaintiff asserts that he is

unable to eat when he wants because he must correlate the timing of his meals in order to prevent

hyperglycemia. Plaintiff claims that work on the third shift schedule prevents him from

consistently controlling the timing of his meals. Plaintiff contends that he is so tired from

working at night, on days he is not at work, he sleeps through the otherwise regular time for him to eat. Plaintiff's physician, Dr. Prenger, has directed Plaintiff to test his blood sugar an average of 2-3 times per day and maintain a consistent eating schedule to help regulate his blood sugar. (*Prenger Affidavit* at ¶¶ 4-5). Dr. Prenger states that "[w]orking the third shift contributed to Jon's blood sugar spikes because it impaired his ability to maintain a consistent eating schedule." (*Id.* at ¶ 3). Dr. Prenger also states that, while food selection is essential to control Plaintiff's diabetes, the "timing of meals [is] of central importance in maintaining a constant blood/sugar level." (*Id.* at ¶ 6).

The Defendant argues that Plaintiff is not substantially limited in his ability to eat because he could, when not at work, wake up during the night to eat meals in order to achieve the proper consistent eating schedule for his diabetes. Further, Defendant points out that Plaintiff has not adhered to Dr. Prenger's advice as to diet and exercise. Dr. Prenger recommended Plaintiff follow a 1800 calorie American Diabetes Association diet and that he exercise four times per week for thirty to forty minutes. (*Prenger Depo.* at 12-13). Dr. Prenger testified that, although Plaintiff was on medication, he was not dieting properly nor exercising[3]. (*Id.* at 13). In the Court's view, consistent with the Supreme Court's decision in *Sutton*, it is appropriate to consider the effect of these factors on the Plaintiff's impairment in determining whether he is

---

[3]Plaintiff's former supervisor, Mr. Lloyd, testified on deposition that Plaintiff consumed potato chips, doughnuts, brownies, and soda pop while at work. (*Lloyd Depo.* at 52). Plaintiff denies this, stating that he "never consumed potato chips, brownies and 2-liters of pop while at work." (*Plaintiff's Affidavit* at ¶ 11). According to Plaintiff, "[o]n rare occasions I would bring in doughnuts for the entire department. On these occasions I would have a doughnut or two." (*Id.*) Regardless of the precise composition of Plaintiff's diet, it is undisputed that Plaintiff was not following the diet recommended by his physician.

substantially limited in a major life activity[4].

Taking all of the pertinent evidence into consideration, this Court concludes that genuine issues of material fact exist as to whether Plaintiff is substantially limited in his ability to eat so as to render him disabled for purposes of the ADA.  It is undisputed that Plaintiff must maintain a consistent eating schedule in order to control his diabetes.  The impact this has on Plaintiff is permanent or long term.  While it is undisputed that Plaintiff has not followed his physician's orders as to diet and exercise, it remains clear that in order to control his diabetes, the timing of his meals is critical[5].  From this fact, the Court finds that a reasonable jury could conclude that

---

[4]Plaintiff argues in his Memorandum *contra* that the ability to control his diabetes with diet and exercise are hypothetical factors which *Sutton* directs should not be considered.  In *Sutton*, the Supreme Court held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures--both positive and negative--must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act."  527 U.S. at 482.  This Court does not view Plaintiff's ability to control his diabetes through diet and exercise as hypothetical since Plaintiff's physician prescribed such measure.  In the Court's view, the fact that Plaintiff is not adhering to the directive should be considered in the analysis.

[5]Defendant cites *Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995) and *Burroughs v. City of Springfield*, 163 F.3d 505 (8th Cir. 1998) in support of the argument that Plaintiff's failure to diet and exercise properly is fatal to his claim.  In *Siefken*, Plaintiff, a police officer, suffered a diabetic attack while driving.  He drove erratically through a residential neighborhood until he was stopped by other police officers.  After the incident, he was placed on administrative leave.  Plaintiff challenged the action as discrimination on account of his disability.  The court dismissed the claim finding that "when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet 'the employer's legitimate job expectations,' due to his failure to control a controllable disability, he cannot state a cause of action under the ADA."  *Id.* at 667 (citation omitted).

In *Burroughs*, Plaintiff, also a police officer, claimed he was terminated because of his disability after two incidents where he suffered diabetic attacks and became dysfunctional while on duty.  Plaintiff did not claim he needed an accommodation.  The court found *Siefken* persuasive and similarly held that there was no cause of action under the ADA when one who is afflicted with a disability and needs no accommodation fails to meet the employer's job expectations.

These cases do not control the issue at bar.  Here, Plaintiff claims that he is substantially limited in a major life activity.  There was no such claim in either *Siefken* or *Burroughs*.  In addition, unlike Plaintiffs in those cases, Plaintiff here claims that he is in need of accommodation.  In view of these distinguishing facts, the Court finds that *Siefken* and *Burroughs* are not preclusive of Plaintiff's ADA claim in this case.

Plaintiff is substantially limited in the ability to eat[6]. The Court cannot conclude, as a matter of law, that Plaintiff is not so limited.

The Court now considers the remaining elements of a *prima facie* case for disability discrimination, which are: that Plaintiff is otherwise qualified for the position, with or without reasonable accommodations; that he suffered an adverse employment decision; that the employer knew or had reason to know of the Plaintiff's disability; and the position remained open while the employer sought other applicants or the disabled individual was replaced.

There is no dispute as to these remaining elements. Nevertheless, Defendant argues that summary judgment is warranted because it had a legitimate nondiscriminatory reason for Plaintiff's discharge. Thus, the Court proceeds with the burden-shifting analysis.


**2. Defendant's Reason for the Adverse Action**

The burden of production now shifts to the Defendant to proffer a legitimate, nondiscriminatory reason for the adverse action taken. Defendant submits that it terminated Plaintiff from employment for falsifying his timesheet. Plaintiff admits that his timesheet reflecting that he worked on October 10 and 11, 2002 was not accurate, because he did not

---

[6]The case of *Branham v. Snow*, 392 F.3d 896 (7th Cir. 2004), is instructive on this issue. There, Plaintiff suffered from Type I diabetes, which requires the injection of insulin. Plaintiff controlled his condition through insulin injections, diet and exercise. Plaintiff worked for the Internal Revenue Service but was not selected to be a Criminal Investigator on account of his medial condition. Plaintiff sued under the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, claiming that his diabetes substantially limited him in the major life activities of eating and caring for himself. On appeal, the Seventh Circuit found that genuine issues of material fact existed as to whether the Plaintiff was disabled. The Court noted that Plaintiff's eating was dictated by his blood sugar levels and therefore, the timing of his meals was critical to his health. From this, the court found that Plaintiff could be considered disabled.

actually work on those days.  (*Plaintiff's Depo.* at 272-74).  According to Plaintiff, this

inaccuracy was an accident.  (*Id.* at 276).  On deposition, Plaintiff testified that he had actually

completed the timesheet prior to the start of the pay period, on October 6, 2002.  According to

Plaintiff, "[i]t was common practice to fill the timesheet out ahead of time.  Most people did it."

(*Id.*).  When the timesheet was submitted on October 13, Plaintiff testified that he was in the

midst of a diabetic attack and unable to check the hours reported.  (*Id.* at 284).

Despite Plaintiff's explanation, it is clear that Defendant has proffered a legitimate reason

for the discharge.  The burden now shifts back to the Plaintiff to show that the Defendant's

proffered reason is merely a pretext for discrimination.


### 3. Pretext

The Plaintiff argues that the Defendant's stated reason for his termination is pretext for

disability discrimination.  The Sixth Circuit has recognized three primary ways for a Plaintiff to

show that the Defendant's proffered reason for the adverse employment action is pretextual.  The

Plaintiff may show "'either (1) that the proffered reasons had no basis in fact; (2) that the

proffered reasons did not actually motivate his [or her] [adverse action]; or (3) that they were

insufficient to motivate [the adverse action].'"  *Weigel v. Baptist Hospital of East Tennessee*, 302

F.3d 367, 377 (6th Cir.2002), quoting *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d

1078, 1084 (6th Cir.1994).

In *Reeves,* the Court outlined the Plaintiff's burden as to pretext:

Proof that the Defendant's explanation is unworthy of credence is simply one form
of circumstantial evidence that is probative of intentional discrimination, and it
may be quite persuasive.... In appropriate circumstances, the trier of fact can

14

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.... Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.... It suffices to say that, because a prima face case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination.

530 U.S. at 147-49 (internal citations omitted).

Plaintiff in this case relies on the second method of showing pretext, *i.e.*, that the discharge was not actually motivated by the submission of a false timesheet. In support of this position, Plaintiff relies on the testimony of Ms. Henderson, Human Resources Manager; Mr. Lloyd, his immediate supervisor; and Mr. Slicker, who was Lloyd's supervisor. Henderson testified on deposition that Defendant considered Plaintiff's medical absences to be excessive. (*Henderson Depo.* at 67-68). Slicker sent the following e-mail to Henderson regarding Plaintiff calling in sick when scheduled to work on weekends: "Our thoughts are that this is more of a

15

'weekend' diabetes. Seems to be more of the same pattern . . . . This is effecting others that work this shift. They are having to work short and since he has made it know [sic] he doesn't want to work weekends, it is starting to cause some morale issues. . ." (Exhibit 4 attached to *Slicker Depo.*). Plaintiff's direct supervisor, Brian Lloyd, testified that he viewed Plaintiff's medical problems as the result of him not taking proper care of himself. (*Lloyd Depo.* at 52).

From this, Plaintiff argues that the true motivation for his discharge was his disability. Plaintiff further argues that terminating him was a more drastic a step than what was ordinarily taken for an erroneous timesheet. On deposition, Slicker testified that he would "sometimes" consult an employee when discovering an error on a timesheet. (*Slicker Depo.* at 36). In this case, Plaintiff was not consulted regarding the time calculation. Slicker did, however, check the door card scanners to ensure that Plaintiff was not at work on the two days at issue. (*Id.* at 64). Slicker and Henderson then met with Plaintiff on October 22, 2002 to discuss the matter. At that time, Plaintiff explained the error. (*Plaintiff's Depo.* at 287). Despite the explanation offered by Plaintiff, he was terminated from employment on November 4, 2002. (*Id.*).

Defendant argues that the evidence is insufficient to show pretext for two reasons. First, Defendant notes that Plaintiff admitted on deposition that he has no "facts" to support a showing of pretext. Second, Defendant argues that Plaintiff cannot rebut Defendant's "honest belief" that Plaintiff falsified his timesheet.

As to the former assertion, Plaintiff was asked on deposition whether he has any "facts to dispute the reasons [Defendant] gave [Plaintiff] for the termination?" (*Plaintiff's Depo.* at 336). Plaintiff said he did not. (*Id.*). Contrary to Defendant's assertion, the Court does not view Plaintiff's testimony as precluding a showing of pretext. Whether Plaintiff can establish pretext

16

must considered in view of the record as a whole, not simply from one response Plaintiff gave on deposition.

Defendant also argues that Plaintiff cannot show pretext because it honestly believed the reason given for the termination. The "honest belief" doctrine derives from a series of Seventh Circuit decisions. As applied by the Seventh Circuit, the rule is that so long as the employer's proffered reason is honestly held, the Plaintiff cannot show pretext even if the reason is ultimately found to be foolish, mistaken, trivial or baseless. *See Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672 (7th Cir. 1997); *McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368 (7th Cir. 1992); *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557 (7th Cir. 1987).

In *Smith v. Chrysler*, 155 F.3d 799 (6th Cir. 1998), the Sixth Circuit adopted a modified version of the rule. The court stated that "[t]o the extent the Seventh Circuit's application of the 'honest belief' rule credits an employer's belief without requiring that it be reasonably based on particularized facts rather than on ignorance and mythology, we reject its approach." *Id.* at 806[7]. The court held:

> [I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. If the employer is unable to produce such evidence to support its employment action, then the "honest belief" rule does not apply. Even if the employer is able to make such a showing, the protection afforded by the rule is not automatic. As was noted in *Pesterfield*, once the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce "proof to the contrary." 941 F.2d at 443. As one court noted in a similar context, "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful *motive for doing so." Fischbach v. District of Columbia Dept. of*

---

[7]The Court notes that Defendant in this case erroneously relies on the Seventh Circuit's verison of the rule instead of the modified version applied in this circuit. (*See Defendant's Reply Memorandum* at 11-12).

*Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (holding that the plaintiff failed to establish that the employer's proffered nondiscriminatory reason was pretextual).

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Cf. Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (explaining that an employee establishes pretext "by showing that the employer's proffered explanation is unworthy of credence."). Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

*Id.* at 807-08.

In this case, Defendant argues that it has shown reasonable reliance on particularized facts, *i.e.*, the false timesheet, at the time the decision to terminate Plaintiff was made. The Court finds genuine issues of material fact in this regard. At the time of Plaintiff's termination, Defendant knew Plaintiff's explanation for the error in his timesheet. Therefore, whether Defendant's reliance was reasonable and based on an honestly held belief cannot be determined as a matter of law. This must be left to the trier of fact to resolve. The Court concludes that Plaintiff has come forward with sufficient evidence to establish a genuine issue of material fact as to whether the reason for his termination was pretext for unlawful discrimination.

The Plaintiff has, for purposes of summary judgment, established sufficient evidence of pretext, under the second and third prongs set forth in *Weigel* and *Manzer*, *supra*.

The Court briefly addresses Defendant's assertion that a mere dispute as to why the

underlying infraction was committed by the employee is an insufficient basis to overcome the honest belief rule. Defendant relies on the case of *Beene v. St. Vincent Mercy Med. Ctr.*, 111 F.Supp.2d 931 (N.D. Ohio 2000) in this regard. The Court finds this case distinguishable.

In *Beene*, Plaintiff, a nurse, was terminated for numerous missteps in caring for patients, including falsifying a medical chart. Plaintiff was unable to establish a *prima facie* case of race discrimination under Title VII. In addition, the court held that even if Plaintiff could establish a claim, there was no evidence of pretext. The court held that "absent evidence that the employer manufactured an infraction to cover up discriminatory motive, a mere dispute as to why the employee actually committed the underlying infraction is insufficient to go to trial." *Id.* at 938.

The Court does not agree with Defendant that this holding stands for the proposition that Plaintiff must necessarily show a manufactured infraction in order to overcome an employer's honest belief. As the Sixth Circuit held in *Smith*, the focus is whether the employee can produce sufficient evidence to challenge the employer's honest belief. Further, such a broad reading of *Beene* would mean that the decision of the district court in that case had effectively overruled the Sixth Circuit's caselaw in *Weigel* and *Manzer*, which established a framework for analyzing the Plaintiff's burden in establishing pretext. In the Court's view, a challenge to an employer's honest belief does not necessarily mean that the employee must show the reason given by the Defendant was manufactured.

In sum, the Court finds that genuine issues of material fact exist as to the issue of pretext. Thus, the Defendant's motion for summary judgment on Plaintiff's ADA disparate treatment claim is denied.

19

## B. Failure to Accommodate

Plaintiff also claims that the Defendant failed to accommodate his disability by refusing to place him on day shift work, in violation of the ADA. The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).

In order to state a claim under this provision, the Plaintiff must show that he has a disability, that he is otherwise qualified for the position, and that the Defendant refused to make a reasonable accommodation. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997). For the reasons stated above, the Court finds a genuine issue of material fact as to whether Plaintiff is disabled for purposes of the ADA. Irrespective of this conclusion, the Defendant argues that Plaintiff cannot show that it refused to make a reasonable accommodation for Plaintiff.

A "reasonable accommodation" may include, "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position. . . ." 42 U.S.C. § 12111(9). An employee claiming that his employer failed to reasonably accommodate his disability "must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation. If the plaintiff establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship." *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 728 (6th Cir. 2000).

In this case, Plaintiff requested to be taken off third shift work. (*Plaintiff's Depo.* at

20

265).  In September 2002, Plaintiff presented Ms. Henderson with a letter from his physician, Dr.

Scott Prenger, regarding his diabetes. (*Id.* at 262-65; Depo. Exhibit 16). The letter states:

> Jon is a 36-year-old patient of mine that suffers from obstructive sleep apnea,
> severe allergies, and type II diabetes.  Jon is currently working an overnight shift,
> which I assume to be poorly influencing his health.  It makes it very difficult with
> him being a diabetic to work odd hours during the week and weekends resume
> normal hours when he is not working.  It is best for diabetics to plan their
> schedules and try to eat their meals at the same time.  This has been [a] difficulty
> for Jon in maintaining adequate blood sugar control, as well as getting into a
> regular exercise pattern.  He also suffers from obstructive sleep apnea and often
> has difficulty sleeping when he gets home from work. Any changes that you can
> make to his work schedule in order to accommodate these needs would be greatly
> appreciated.

(Depo. Exhibit 16).  Henderson testified that she did not understand the need for moving

Plaintiff off the third shift since he had access to a microwave and refrigerator to assist him in

regulating his eating schedule while on third shift. (*Henderson Depo.* at 172).  Henderson asked

for more specific information.  Plaintiff contacted Dr. Prenger in this regard, but was terminated

prior to the information being submitted. (*Plaintiff's Depo.* at 267).

Defendant argues that since additional information was never provided from Plaintiff's

physician, Plaintiff is at fault for a breakdown in the accommodation process.  Arguably, Dr.

Prenger's September 2002 letter was sufficient to advise Defendant of the sort of accommodation

requested. As Dr. Prenger states, it is not simply access to meals but the timing of the meals that

is critical to Plaintiff's health. Dr. Prenger specifically asks that Plaintiff be taken off third shift

work.  In view of the specificity of the request made, the Court does not agree with Defendant

that Plaintiff caused a breakdown in the accommodation process.

Defendant does not contend that accommodating Plaintiff would have created an undue

hardship.  Rather, Defendant maintains that there was no need to accommodate Plaintiff because

Dr. Prenger conceded on deposition that if Plaintiff were to eat during the night on his days off, he would achieve the consistent eating schedule needed for his diabetes. (*Prenger Depo.* at 31). Defendant argues that it therefore was not obligated to accommodate Plaintiff when he could achieve the result himself. According to the Defendant, the request for accommodation was not job-related.

The regulations to the ADA define the term "reasonable accommodation" in the following way:

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1)(ii).

Defendant notes that Plaintiff testified on deposition that he was able to perform the essential functions of his job on third shift. (*Plaintiff's Depo.* at 306). It is undisputed, however, that Plaintiff had attendance problems due to his difficulty in maintaining his blood sugar while on this shift[8]. Therefore, the Court is not prepared to conclude, as a matter of law, that Plaintiff's

---

[8]Ms. Henderson notes that Plaintiff missed an average of 11.4 hours per month of work when he was on third shift, from February 3, 2002 to October 15, 2002. (*Henderson Affidavit* at ¶ 6). When he worked on first and second shift, Plaintiff missed an average of 13.3 hours per month, from January 1, 2001 to November 27, 2001. (*Id.* at ¶ 4). The Court observes, however, that Plaintiff worked first and second shift prior to suffering the diabetic coma. Without medical evidence as to the state of the Plaintiff's medical condition prior to the diabetic coma in October of 2001, Plaintiff's pre and post-coma work history is not helpful to the analysis.

request for accommodation was not job-related.  The Court finds that a genuine issue of material

fact exists on the issue of whether Defendant should have accommodated Plaintiff's request to be

transferred from the third shift.  In view of Dr. Prenger's opinion, it is arguable that Plaintiff is

disabled and should have been accommodated.

Finally, Defendant argues that Plaintiff should be precluded from maintaining an

accommodation claim because Plaintiff was allegedly told that he could apply for a position in

the Call Center, which was only first shift work.  On deposition, Plaintiff was asked whether he

looked into the possibility of applying for another position.  (*Plaintiff's Depo.* at 250).  Plaintiff

said he did not.  (*Id.* at 252-53).  What is more significant, in the Court's view, is that Plaintiff

did affirmatively seek accommodation as to the job he then held, but was discharged before a

decision on that request was made.

In the Court's view, whether Defendant's alleged suggestion regarding the Call Center

was sufficient to discharge its duty to accommodate Plaintiff, assuming that Plaintiff is disabled

under the ADA, is a matter for the trier of fact to assess.  In sum, the Court concludes that

Defendant is not entitled to summary judgment on Plaintiff's failure to accommodate claim.


**C.  State Law Claims**

In his Complaint, Plaintiff asserts state law claims for handicap discrimination under R.C.

§§ 4112.01 and 4112.99, violation of Ohio public policy and intentional infliction of emotional

distress.

Both Plaintiff and Defendant correctly observe that Plaintiff's claim for handicap

discrimination under Ohio law involves the same essential elements as Plaintiff's ADA claim.

*See Hedrick v. Western Reserve Care System*, 355 F.3d 444, 452 n.4 (6th Cir. 2004).  Thus, since summary judgment is not appropriate on Plaintiff's ADA claim, it is not appropriate on Plaintiff's claim under Ohio law for handicap discrimination.

In opposing the Defendant's Motion for Summary Judgment, Plaintiff makes no reference to the earlier asserted claims for violation of public policy and intentional infliction of emotional distress under Ohio law.  These claims are therefore dismissed as abandoned.


## IV.

In light of the foregoing, the Defendant's Motion for Summary Judgment (**Doc. #14**) is **DENIED.**

                    **IT IS SO ORDERED.**



    1-20-2006
**DATE**                                **EDMUND A. SARGUS, JR.**
                                        **UNITED STATES DISTRICT JUDGE**